IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARCIE MORGAN, as guardian *ad litum* on
behalf of Alicia Morgan,

               Plaintiff,

    v.

BEND-LA PINE SCHOOL DISTRICT; JOHN
MAHONEY; DAN McNAIRY; and SHERRY
BROOKE, each individually and in their official
capacities,

               Defendants.

CV-07-173-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Marcie Morgan, brings this action as the guardian *ad litum* for her disabled

daughter, Alicia Morgan ("Morgan"),[1] who attended schools in the Bend-La Pine School District

---

[1] Originally, this case was filed using Morgan's initials in the caption. Morgan is no longer a minor and none of the other individuals involved in the relevant incidents have provided any reason to seal documents relating to them. Thus, this court has since unsealed two affidavits and uses the full name of all individuals in both the caption and text of this Opinion and Order.

("District").  Following difficulties in a mainstream public elementary school during the 2000-01

school year, Morgan underwent a series of evaluations in the spring of 2001 and was then placed

in the RiverBend Alternative Middle School ("RiverBend") for seventh grade during the 2001-02

school year.  Morgan remained at RiverBend through February 2004, when her parents withdrew

her after discovering the incidents that form the basis of this lawsuit.

Marcie Morgan alleges that, commencing in the 2002-03 school year and continuing until

February 2004, her daughter was subjected to unwanted student-to-student sexual discrimination,

harassment, and abuse while attending RiverBend.  She alleges that three teachers at RiverBend,

including defendants John Mahoney ("Mahoney"), Sherry Brooke ("Brooke"), and Dan McNairy

("McNairy"), were aware of the harassing and abusive incidents at or around the times they

occurred and failed to report them, despite being mandatory reporters of child abuse pursuant to

ORS 419B.010.  She further alleges that Mahoney and Brooke insisted that Morgan conceal the

incidents and that none of the individual defendants took any effective action to end the

harassment, despite knowing Morgan was disabled and more susceptible to this type of abuse.

Marcie Morgan brings claims on behalf of her daughter:  (1) against both the District and

RiverBend's teachers for a violation of the due process clause ("First Claim) and the equal

protection clause ("Second Claim") pursuant to 42 USC § 1983 and; (2) against the District for

violation of Title IX of the Educational Amendments of 1972, 20 USC §§ 1681-1688 ("Third

Claim").  This court has original jurisdiction over these federal statutory claims under 28 USC

§ 1331.  All parties have consented to allow a Magistrate Judge to enter final orders and

judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Defendants filed a Motion for Summary Judgment (docket #46) against all three claims. For the reasons that follow, defendants' motion is granted.

## LEGAL STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988) (citation omitted). The Ninth Circuit has stated, "[n]o longer can it be

argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

## UNDISPUTED FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court views the evidence most favorably to Marcie Morgan. A review of the parties' submissions[2] reveals the following facts:

## I. Morgan's Disabilities and School Placements

### A. Morgan's Disabilities

Born in April 1989, Morgan was 11 to 12 years old while a sixth grade student at LaPine Middle School in 2000-01. Ex. M, p. 1 (4/17/01 Individual Education Program "IEP" 4/17/01).[3] She was struggling in school and it was "difficult for her to participate in the regular education curriculum without the support of special education." *Id* at 4.

In the spring of 2001, around the time she reached her twelfth birthday, Morgan underwent a series of evaluations in order to determine her qualification for special education services and an appropriate school placement. Ex. O (3/19/01 Speech Language Evaluation); Ex. N (4/6/01 Interpretive Psycho-Educational Report); Ex. M (4/17/01 IEP). Morgan was identified as having several disabilities: Attention Deficit/Hyperactivity Disorder ("ADHD"); Emotional Disturbance; Communication Disorder; and other Health Impairments, such as muscular dystrophy and severe arthritis. Ex. M, p. 4; M. Morgan Depo., pp. 137-38. The

---

[2] The parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

[3] References to exhibits are to the documents attached to the Declaration of Charese Rohny in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (docket #56).

District's School Psychologist diagnosed Morgan with social-emotional maladjustment issues which had led to social withdrawal/isolation.  Ex. N, p. 7.  She was described as "unable to demonstrate her knowledge in many areas due to her inability to express her thought verbally in a sequential and logical manner."  Ex. O, p. 4.  Marcie Morgan was deeply concerned that her daughter was not getting the help she needed.  Ex. M, p. 4.

### B.  Placement at RiverBend

After Morgan completed this battery of evaluations, her parents and the members of her IEP Team agreed in late April 2001 that she required the support of special education and should be placed in RiverBend the following school year.  *Id*; Ex. VV (4/25/01 District SED Meeting Summary); Hensley Depo., pp. 26-29.  Brooke was on the IEP Team when it reached that conclusion.  M. Morgan Depo., p. 71.

RiverBend is an alternative middle school in Bend, Oregon, that opened in about 2000. Hensley Depo., p. 14.  According to the RiverBend Program Information and Overview handout, RiverBend is student-centered and provides a high level of supervision and behavioral support and training.  Ex. T, p. 1 (RiverBend at Tamarack Program Information and Overview).  A core part of the RiverBend education is the outdoor expeditions taken throughout the year.  *Id*.

RiverBend is designed for "students experiencing chronic and severe behavioral / emotional / social issues that significantly impact academic and personal success in the regular educational setting."  Ex. T, p. 1 (RiverBend Program Information and Overview); Hensley Depo., p. 22.  The student population at RiverBend is a "very difficult population," including students with histories of violent, acting-out behaviors, and may include students with a history of sexual abuse or who are documented sexual offenders.  *Id* at 32.  The teacher-to-student ratio

is approximately three-to-one. *Id* at 64. RiverBend teachers and Tracy Reynolds ("Reynolds"), a behavioral specialist with the District, participated in monthly "site meetings," during which teachers from all of the District's "behavior programs" discussed issues, policy, and other topics of interest. Reynolds Depo., p. 9; Mahoney Depo., p. 144. This was an appropriate venue for RiverBend teachers to discuss their concerns related to potential issues of student harassment or abuse. Reynolds Depo., p. 10; Mahoney Depo., pp. 145-46.

Despite placement in special education at RiverBend, Morgan continued to experience difficulties with peer relationships, preferring to interact with children much younger than herself or with adults. After an evaluation by the Central Oregon Regional Program, her IEP team determined that Morgan met the eligibility requirements to receive special education as a student with Autism Spectrum Disorder ("ASD"). Ex. P, p. 1; Ex. R (4/17/01 and 4/15/02).

## II. **Knowledge of Morgan's Susceptibility to Abuse**

Students with disabilities, like Morgan, are a "vulnerable population" who are "more easily taken advantage of." Hinman Depo., pp. 43, 47-48. Between 2001 and 2003, Marcie Morgan raised concerns with Brooke and Mahoney "that [her daughter] was not being watched carefully enough and closely enough at school, and that her peers were picking on her, teasing her." M. Morgan Depo., pp. 71-75. Although Marcie Morgan never personally observed any of that verbal abuse, a student who attended RiverBend during the 2003-04 school year "[o]ccasionally observed [Morgan] receive negative and unwanted teasing by other students." Liston Decl., ¶¶ 3, 8.

The 2002 IEP explains that Morgan does not understand the social nuances that surround her, which could easily lead to her becoming a target of more socially "aware" peers. Ex. Q, p. 3

(4/04/02 IEP).  The 2003 IEP describes Morgan as "a delightful and likeable young lady" who loved "any kind" of positive attention.  Ex. S, p. 6 (4/04/03 IEP).

### III.  Sexually-Charged Conduct Involving Morgan

At the time Morgan began attending RiverBend, she was the only female student out of a total of 21 students.  A. Morgan Depo., p. 23.  Some time later, two additional female students began attending RiverBend.  *Id.*  One of those girls was younger than Morgan and not in her classroom.  *Id* at 23-24.  Another girl, Nina Bednarczyk ("Bednarczyk"),[4] began attending RiverBend some time in the 2002-03 school year in Morgan's sixth grade classroom and soon became Morgan's "best friend."  *Id* at 24; Exs. RR & SS.

#### A.  John Day River Rafting Trip

In mid-May 2003, shortly after she reached age 14 and while an eighth grade student at RiverBend, Morgan attended a four day, three night rafting/camping trip on the John Day River with RiverBend students and staff.  On the second day of that trip, Morgan and her "best friend," Bednarczyk (age 13 years, 2 months), walked with two male students, Mitchell Storey ("Storey")[5] (then just a month shy of age 13) and Devon Walker ("Walker") (age unknown), up a hill next to one of the camp sites.  A. Morgan Depo., pp. 50-51, 54.  Storey then asked Morgan if she could "flash" him.  *Id* at 50-51.  Morgan did not know what Storey meant, so he demonstrated for her, lifting up his shirt and telling her that "girls think it's fun, girls like it."  *Id* at 52.  Morgan asked if Bednarczyk would do it with her, and then both Morgan and Bednarczyk

---

[4] Bednarczyk is eleven months younger than Morgan.  Exs. QQ, RR & SS.

[5] Storey is one year younger than Morgan.  Ex. II, p. 1.  He apparently began attending RiverBend in the fall of the 2002-03 school year.  Ex. HH, p. 2 (indicating short-lived placement at Rimrock Academy during 2002-03 school year); Storey Decl., ¶ 3.

lifted their shirts. *Id* at 53. Morgan was wearing a brassiere, which she kept on during this

incident. *Id*. Both Storey and Walker witnessed this "flashing" incident. *Id*; Storey Decl., ¶ 10.

Bednarczyk and Walker then went further up the hill ahead of Morgan and Storey. A.

Morgan Depo., p. 54. Storey then asked Morgan if she knew what "fingering" was, trying to

"show [her] with his fingers. *Id*.[6] She asked him what it was for, to which Storey said it was

"fun" and was "where a guy sticks his finger in your private." *Id*. He reached for her pants

button, and she told him "Stop" and "No," but then, because she was "vulnerable at the time," let

him undo the top button and try to put his hand down her pants. *Id*. Storey touched Morgan's

pubic hair but did not penetrate her in any way. Storey Decl., ¶ 9. At that point, Walker said a

teacher was coming and Morgan ran up the hill. Mahoney approached Morgan and asked "what

happened up there?," to which Morgan replied "Nothing. We were just hanging out and talking."

A. Morgan Depo., p. 56.

The following day, during a van ride, Walker and Storey were riding in the seat behind

the one occupied by Morgan and Bednarczyk. A. Morgan Depo., pp. 73-74. Walker told

Morgan that Storey wanted her to give him a "hand job" by touching Storey's penis and rubbing

her hand up and down.[7] A. Morgan Depo., pp. 75-76; Storey Decl., ¶ 11. Morgan reached back

and did as Storey instructed. *Id* at 76. Later that evening at the overnight campsite, Morgan

decided to sleep outside of her tent on the ground. *Id* at 74. Storey woke Morgan up and asked

---

[6] At some time prior to this, Storey had apparently asked to "finger" Morgan; Morgan had asked Bednarczyk what it was, to which Bednarczyk had responded "Just do it." A. Morgan Depo., p. 55.

[7] Storey states that he "witnessed [Morgan] giving a male student a 'hand job'" while riding in a school vehicle with both Mahoney and McNairy in the front of the vehicle. Storey Decl., ¶ 8. He also states that Morgan "[o]n another occasion . . . touched [his] penis," but does not specify when that "other occasion" took place. *Id* at ¶ 11. For purposes of this motion, the court accepts Morgan's version of the events on the John Day River trip.

her to go with him up near the outhouse.  Morgan, Storey, Walker, and Bednarczyk all went

toward the outhouse, and Storey told her to give him another hand job, which Morgan did.  *Id* at

74-76.  Storey also again touched Morgan's genital area, but again denies penetrating her vagina.[8]

Storey Decl., ¶ 12.

    Shortly after returning from the John Day River Trip, Mahoney and Brooke learned about

the "flashing"[9] incident involving Morgan, Bednarczyk, Storey, and Walker, but not about any

touching.[10]  Mahoney called Bednarczyk into his office and asked what happened "up on the

hill."  A. Morgan Depo., p. 57.  Morgan does not know what Bednarczyk told Mahoney.

Mahoney then called Morgan into his office, telling her that the teachers "kn[e]w what's been

happening, and we're going to be telling your parents."  A. Morgan Depo., p. 57.  Morgan

---

[8]  Storey states that he first touched Morgan's "pubic hair," and that he later touched her "vagina," but that he "didn't penetrate her vagina either time with [his] fingers."  Storey Decl., ¶¶ 9, 12.  This information is likely provided to preclude criminal charges against Storey which turn on whether a defendant "penetrates the vagina" (among other requirements).  *See*, *e.g.*, ORS 163.411 (unlawful sexual penetration in the first degree).  For purposes of this Opinion and Order, it is sufficient to note that Storey twice touched Morgan's genital area.

[9]  Morgan contends that RiverBend's teachers knew in May 2003 about the "flashing" by Morgan and Bednarczyk, as well as about the "fingering" of Morgan by Storey.  However, the record does not support the conclusion that RiverBend's teachers had notice of any touching (as opposed to "flashing" or "mutual exposure") until October 2003, during the fall of the following school year, some time after another field trip to Smith Rock State Park.

    Morgan testified unequivocally that, although she asked Mahoney what the term "fingering" meant, she did not tell Mahoney that Storey had touched her.  *Id* at 58.  To the contrary, Storey states that "upon our return . . . I admitted to [Brooke and Mahoney] that I touched classmate A.M.'s vagina."  Storey Decl., ¶ 13.  Storey does not state exactly when he made that admission, but does state that he was "questioned by an Oregon State Police Detective approximately five or six months after I initially spoke with John Mahoney about the first incident of sexual touching of [Morgan]."  *Id* at ¶ 17.  Since Storey's interview took place on March 1, 2004, his first conversation with Mahoney regarding "sexual touching" occurred some time between September 1 and October 1, 2003.  Ex. W, p. 8.

    Brooke and McNairy assert that the first notice they had of any "exposure incident" was in October 2003 and that, after an investigation, Mahoney and Brooke concluded that what had taken place five months prior was a "mutual exposure incident."  Brooke Decl., ¶ 5; McNairy Decl., ¶¶ 5-7, 10.  This testimony implies that notice of any touching came even later than October 2003.  However, the letter that Mahoney penned after the call from Marcie Morgan in February 2004 indicates that RiverBend's teachers first learned that Morgan had been "touched" by October 22, 2003.  Ex. V, p. 1.

    This court is required to accept all inferences in Morgan's favor and, therefore, assumes that RiverBend's teachers knew about the "flashing" incident by May 2003, and learned that Morgan had been "touched" by another student on or about October 22, 2003.

[10]  There is no evidence that any RiverBend teacher knew about the allegation regarding the two "hand jobs" Morgan performed on Storey until the telephone call from Marcie Morgan in February 2004.  A. Morgan Depo., pp. 78-79; Mahoney Depo., pp. 67-71; Brooke Depo., pp. 101, 140.

pleaded with him not to tell her parents, saying she was afraid she would get in trouble, but

Mahoney told her he was going to tell her parents because it was "very serious." *Id* at 58-59.

When Morgan continued to plead that her parents not be told, Brooke took Morgan's hand,

telling her "don't worry about it" and admonishing Morgan to "just make sure it doesn't happen

again." *Id* at 60.  RiverBend's teachers did not file an incident report and did not tell Morgan's

parents about the "flashing" incident.

### B.  Retention at RiverBend for 2003-04 School Year

Some time prior to the start of the 2003-04 school year, RiverBend teachers

recommended to Morgan's parents that Morgan be retained for another year at RiverBend.

M. Morgan Depo., p. 136.  Morgan's parents agreed because the Bend/LaPine high school could

not guarantee a special education placement for Morgan and they thought that the RiverBend

placement was working well for her due to the smaller class sizes. *Id* at 135-36.  The plan was

that Morgan would enter the regular high school in tenth grade during the 2004-05 school year

after completing a second year of eighth grade at RiverBend during 2003-04. *Id* at 136.

One of the considerations in deciding to retain Morgan at RiverBend was that she was

missing the set of skills needed to manage her emerging sexuality.  Mahoney Depo., p. 193;

McNairy Depo., pp. 82-83.  One concern was that, due to her naiveté and lack of understanding

and education about sexually appropriate behavior, Morgan might find ready acceptance from

boys by performing sexual favors.  Brooke Depo., pp. 90-91.  RiverBend's teachers "predicted

that [her physical maturity and related behaviors] would occur," and had discussed how they

would handle that inevitability.  Mahoney Depo., p. 193.

///

## C. **Smith Rock State Park Trip**[11]

In the fall of 2003, Morgan – who at that time was about 14½ years old – attended an overnight school camping trip to Smith Rock State Park.  Wright Decl., ¶ 8.  Because Morgan was the only girl on that trip, she had a tent to herself.  A. Morgan Depo., p. 29.  Morgan had been "going out" for about a week with another RiverBend student, Neal Wright ("Wright").[12]  *Id* at 34-35.  Morgan went in her tent to put on long pants because she was getting cold.  *Id* at 31.  Storey and Wright barged in while she was changing and began asking her a "bunch of questions."  *Id* at 33.  Storey told Morgan that Wright wanted to know if he (Wright) could "touch" her.  *Id* at 34.  She asked Storey what he meant, and he then asked if she knew what "pussy" was.  *Id*.  When she said no, Storey told her "Well, it's your private" and that Wright wanted to "touch it and see it."  *Id*.  Storey also asked Morgan if her private had hair on it.  *Id*. After both Storey and Wright repeatedly asked, Morgan "gave in to peer pressure."  *Id*.  Morgan told Storey to "turn around," and then pulled down her pants to her knees, including her panties, exposing her genital area.  Wright Decl., ¶ 10.  Both Wright and Storey, who "decided to peek and look at [her]" saw, but neither of them touched her at that time.  A. Morgan Depo., pp. 34,

---

[11]  Morgan contends that the Smith Rock State Park Trip took place some time in the spring or fall of 2003 *after* the trip to the John Day River in May 2003.  However, Morgan testified that the John Day River trip took place after the Smith Rock State Park trip (A. Morgan Depo., p. 44) and that when she asked Storey why she should "flash" him when they were on the John Day River trip, he used the "exact same excuse" he had used on the Smith Rock State Park trip, namely that "girls think it's fun, girls like it."  *See* A. Morgan Depo., pp. 39-40, 52.  Moreover, Brooke "deduce[d] that [the Smith Rock State Park trip] was in the spring" because their usual destinations were snowed in.  Brooke Depo., p. 135.  Despite this conflicting evidence, and based on Wright's declaration which was submitted after the hearing on defendants' summary judgment motion, this court will assume for purposes of this motion that, as Morgan contends, the Smith Rock State Park trip took place in the fall of 2003, some months after the May 2003 John Day River trip.  This court also assumes, based on Morgan's allegations, that the Smith Rock State Park trip took place some time prior to October 22, 2003.  *See* Second Amended Complaint, ¶ 23(a).

[12]  Wright was a year and five months younger than Morgan  Exs. KK, LL & MM.  He apparently began attending RiverBend on or about January 17, 2003.  Ex. LL, p. 1 (1/17/03 IEP indicating placement at RiverBend).

36.[13]  Morgan told them she did not want to do that any more, to which they said "Come on, please.  Girls like it.  They like it.  It's fun."  *Id* at 39-40.

Moments later, Mahoney spoke through the tent wall, asking Morgan whether she had anyone else in the tent with her and what they were doing.  *Id* at 35-36.  Storey and Wright told Morgan not to say anything.  *Id* at 35.  She told Mahoney that Storey was in the tent and they were not doing anything.  *Id*.  Mahoney asked them to open the tent, which they did, by which time Morgan was again fully clothed.  *Id* at 36-37.

Morgan did not tell Mahoney or any other students about the exposure incident in the tent.  *Id* at 38, 40.  Instead, the following day, during a van ride home,[14] Morgan asked Mahoney what the term "pussy" meant.  *Id* at 37, 41.  When he asked why she wanted to know, Morgan told him they asked her because "they wanted to see it," but was afraid to tell Mahoney the "whole story" for fear she would get in trouble, so did not tell Mahoney that she had exposed herself to Storey and Wright.  *Id* at 37-38, 41.  Mahoney told her he would be talking to Storey and Wright about it, but that if it happened again, he would be contacting her parents.  *Id* at 37.  Mahoney later reported to Morgan that he had talked to Storey and Wright who denied using the

---

[13]  Wright states that it appeared to him that Storey touched Morgan's genitalia.  Wright Decl., ¶ 10.  There is no evidence in the record from Storey about what took place in the tent at Smith Rock State Park.  In her October 5, 2007 deposition, Morgan repeatedly and explicitly testified that no touching took place on the Smith Rock State Park trip and that she did not tell Mahoney about the exposure incident in the tent.  A. Morgan Depo., pp. 37-38, 41.  Ten months later, in response to defendants' summary judgment motion, Morgan submitted a declaration stating that two male students touched her vagina during the Smith Rock State Park trip and that she reported it to Mahoney.  Morgan Decl., ¶ 6.  Morgan's declaration directly contradicts her repeated testimony concerning the lack of touching and lack of reporting the exposure incident in the tent to Mahoney during the Smith Rock State Park trip and Morgan offers no explanation for the change in testimony.  Thus, this court disregards Morgan's declaration to the contrary (paragraph 6) as sham evidence.  *Adler v. Fed. Rep. of Nigeria*, 107 F3d 720, 728 (9th Cir 1997), *citing Kennedy v. Allied Mut. Ins. Co.*, 952 F2d 262, 266-67 (9th Cir 1991) (district courts may disregard "'sham' affidavits that contradict deposition testimony submitted solely to generate an issue of fact for summary judgment purposes").

[14]  The Smith Rock State Park trip was originally scheduled for two days.  Brooke Depo., p. 134.  Brooke was not there the first night, but arrived the following day.  However, the weather turned cold and rainy, so they drove back to RiverBend and spent the second night sleeping in their sleeping bags in RiverBend's community room.  *Id*.

word "pussy," and denied that anything had happened on the Smith Rock State Park trip.[15] *Id* at 44-45.

On or about October 22, 2003, after a school-wide "discussion of appropriate behaviors and social boundaries," Morgan reported to Brooke that Storey had "grabbed her crotch during a camping trip." Ex. V, p. 2.  This was the first notice to RiverBend's teachers that Morgan had been "touched" by another student.[16]  Mahoney Depo., p. 64; Wright Decl., ¶ 11; Ex. V, p. 1. This conversation precipitated several additional conversations with Morgan that day. RiverBend's teachers conducted a brief investigation and separately interviewed Morgan, Bednarczyk, and Storey.  Ex. V, p. 1; Mahoney Depo., pp. 53-55; McNairy Depo., p. 36. During the course of their investigation, RiverBend's teachers learned that Morgan had participated in an exposure incident, pulling her shorts down and observing Storey pull his pants down.[17]  Mahoney Depo., pp. 64-65.  They also learned that on the John Day River trip, Storey had "touched [Morgan's] pubic area skin to skin once." *Id* at 128.  Mahoney told Storey that he "wanted to keep the police out of it," instructing Storey to not to brag or discuss the events with anyone, and that it was up to Storey whether he wanted to tell his parents.  Storey Decl., ¶ 14.

---

[15] There is no evidence that Mahoney discussed this incident with any other member of RiverBend's staff.  To the contrary, Brooke testified that the very first time she became aware of an allegation that Morgan was touched while in a tent at Smith Rock State Park was when she read it in the pleadings in this lawsuit.  Brooke Depo., p. 133.

[16] Morgan's report to RiverBend's teachers in October 2003 incorporated information from the exposure incident in her tent at Smith Rock State Park.  *See* Mahoney Depo., pp. 64-65.  It also included information from "a pool incident," although defendants identify the date of the pool incident as taking place two months later on December 17, 2003, and Morgan alleges that the pool incident took place in or around January 2004.  Mahoney Depo., p. 64; Ex. V, p. 1; Second Amended Complaint, ¶ 20(g).

[17] This is the only evidence in the record regarding the relative timing of the Smith Rock State Park trip and the first notice to RiverBend's teachers that Morgan had been touched.  It is consistent with the conclusion that the Smith Rock State Park trip took place prior to the revelation by Morgan that she had been "touched" by Storey.

When Mahoney told Morgan that RiverBend's teachers would need to talk to her parents, Morgan "gradually kind of decompensated," "balled up" and got into a "fetal" position, pleading that her parents not be told.  Mahoney Depo., pp. 56, 64-66.  During the interview with Morgan, she was "visually decompensating and perserverating on how her parents would ground her for life, or send her away."  Ex. V, p. 2; Mahoney Depo., p. 56; Brooke Depo., p. 76.  The teachers jointly determined that the incident involved "no force, coercion, or foul play [but was rather an incident] of 'I'll show you mine, if you'll show me yours.'"  Ex. V, p. 2; Brooke Decl., ¶ 5; McNairy Decl., ¶ 7.  In response to Morgan's request not to involve the police, Mahoney and Brooke agreed not to say anything to her parents and instructed her to "make sure it doesn't happen again."  A. Morgan Depo., p. 60.  Mahoney told Storey he was going to write up an incident report (Storey Decl., ¶ 14), but there is no evidence that he ever did.

Two days after Mahoney and Brooke spoke with Morgan, McNairy overheard her discussing this exposure incident with another student, prompting him to talk with Morgan and explain that she should not involve other students in a situation of such a "tender nature."  *Id* at 31-32; Ex. V, p. 1.

### D.  **Pool Incident**

While on a field trip to Juniper Pool on December 17, 2003[18] (Ex. V, p. 2), Morgan was swimming in the deep end of the pool when Storey "sw[am] underneath [her] and grab[bed] the inner thigh of [her] leg."  A. Morgan Depo., p. 81.  During this same pool trip, Morgan was

---

[18]  The report prepared by RiverBend's teachers following the February 2004 phone call from Marcie Morgan indicates that Morgan's October 22, 2003 report of "touching" by other students included information from a "pool incident," which would seem to place the "pool incident" prior to October 22, 2003.  Ex. V, p. 1.  However, all inferences must be drawn in Morgan's favor, so this court will assume that the pool incident indeed took place on December 17, 2003, as later indicated in the report.

asked by Brooke at least twice to sit on the edge of the pool and not wrestle or jump on other

kids.  Brooke Depo., p. 87.  Morgan got out of the water and told Mahoney that Storey had

"touched [her] way too close."  *Id*.  She also told Brooke that Storey had "grabbed her crotch."

Brooke Depo., p. 85.  Mahoney and Brooke spoke with Storey and Morgan, addressing

"boundaries [and telling them] you can't be jumping and wrestling on each other at the pool."  *Id*.

Morgan "indicated that it could very well have just been during horseplay that somebody brushed

her crotch area," but Mahoney nevertheless removed Storey from the pool and made him get

dressed and sit in the bleachers for the rest of the pool trip.  *Id*; A. Morgan Depo., p. 81.

### E.  School Bus Incident(s)

During the last two months of 2003 and continuing into January 2004, Morgan, Wright,

and another male student, Robert Liston ("Liston"),[19] were the only three students riding the

school bus during the approximately 30 mile trip between RiverBend and their homes in LaPine.

Liston Decl., ¶ 9.

Liston, who "had a temper which intimidated [Wright]," initiated games of strip poker on

the school bus.  Wright Decl., ¶ 13.  During the first such game, Liston and Wright prodded

Morgan to lift her shirt, and she eventually succumbed.  A. Morgan Depo., p. 67.  Morgan was

wearing a brassiere at the time, which she left on.  *Id* at 66.  Liston and Wright pulled their pants

down and exposed their genitals.  *Id* at 66; Wright Decl., ¶ 15.[20]  During a later strip poker game,

Liston and Wright exposed their penises through their boxers for Morgan to see, Morgan exposed

---

[19]  Liston is one year younger younger than Morgan.  He apparently began attending RiverBend in November 2002, after an incident involving a verbal and physical assault on several other students at LaPine Middle School on October 31, 2002. Ex. OO, pp. 1-2.  His school records include a notation in October 2001 that he "has trouble keeping . . . [his] hands to himself in class, on the bus, and on the playground.  His actions and verbal expression are sometimes sexual."  Ex. NN, p. 5.

[20]  Wright contends that it was Liston who exposed himself.

her bare breasts to Liston and Wright, and Wright digitally penetrated Morgan's vagina.[21]  Liston

Decl., ¶ 10; Wright Decl., ¶¶ 16-18.  Some time during the last few weeks of January 2004,[22]

Wright and Morgan were the only two students on the school bus.  During that bus ride, Wright

touched Morgan on the vagina two times.  *Id* at ¶ 18.

### F.  **Action Taken Regarding Bus Incident(s)**

After reviewing a video tape routinely taken on the school bus, the bus driver determined

that something suspicious was going on between Morgan, Liston, and Wright.  A. Morgan Depo.,

p. 68.  He told Liston and Wright that they would have to tell Mahoney what they were doing.

*Id*.  Liston and Wright told Mahoney about the strip poker games, but not about any touching.  *Id*

at 68-69; Mahoney Depo., pp. 85-86.[23]  Mahoney then spoke jointly and individually to Liston

and Wright, and asked them to stop the inappropriate behavior.  Liston Decl., ¶¶ 11-12.

Mahoney also spoke with Morgan, Liston, and Wright together.  A. Morgan Depo., p. 70.  Liston

and Wright apologized to Morgan, telling her they knew their behavior was wrong.  *Id* at 68.

---

[21]  With regard to school bus trip incidents, the pleadings allege only one game of strip poker and do not allege any "touching" while on the school bus.  Second Amended Complaint, ¶ 20(e). Consistent with that allegation, Morgan testified as to only a single "bus" incident and testified unequivocally that no "touching" took place on the bus rides. A. Morgan Depo., pp. 64, 67, 71.  However, since the record must be viewed in the light most favorable to her, this court accepts the testimony of Wright of additional incidents, including ones that involved touching, on the bus rides back and forth to LaPine.

[22]  Wright, who was involved in the exposure incident in the tent at Smith Rock State Park, apparently left RiverBend to attend LaPine Middle School some time prior to January 26, 2004. Ex. MM, p. 1 (1/26/04 IEP indicating attendance at LaPine Middle School).

[23]  The record does not support the conclusion that Mahoney or any other RiverBend teacher was told that touching (as opposed to "flashing" incidents during strip poker games) took place on the school bus. Wright does state that "[a]fter one of the first incidents on the school bus, I went to Mr. Mahoney and told him what was happening on the school bus and the strip poker game." Wright Decl., ¶ 19.  That statement does not expressly indicate that Wright told Mahoney that he had touched Morgan's genitals while riding the school bus. Given Morgan's testimony that no touching took place on the school bus (Morgan Depo., p. 67), Mahoney's testimony that he was told about strip poker (as opposed to touching) (Mahoney Depo., p. 85), and Liston's statement that the conversation with Mahoney was about the exposures (Liston Decl., ¶ 11), Wright's vague statement is not enough to raise a genuine issue of material fact that RiverBend teachers were told that Wright was touching Morgan's genitals during school bus rides.

Following that meeting with Mahoney, Morgan had to ride up in the front of the bus and there were no further incidents during school bus rides.  *Id* at 69.

## IV.  Notice to Morgan's Parents

On the evening of February 3, 2004, Morgan revealed to her parents that on one of their school trips, she had masturbated a male student while in the van driving to or from their destination.  M. Morgan Depo., pp. 77, 138; Ex V, p. 1.  Morgan also told her parents that Storey had grabbed her crotch while she was in the Juniper Pool.  Ex. V, p. 2.

On February 4, 2004, Morgan's parents withdrew her from RiverBend and contacted Mahoney, demanding to know why they had not been notified of the ongoing issues involving Morgan.  Mahoney told Marcie Morgan that the first notice the school personnel had of any incident involving touching was on October 22, 2003.  He later authored a lengthy "Incident report review" documenting their telephone conversation and giving his account of the incidents leading up to it.  Ex. V.

## ANALYSIS

## I.  Preemption

A preliminary issue raised in the present motion is whether Morgan's claims under § 1983 are preempted by Title IX.  At the time of oral argument in this case, the circuits were split on this issue.  *See Cmtys. for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F3d 676, 681-91 (6th Cir 2006), *cert. denied*, 549 US 1322 (2007) (discussing cases and allowing equal protection claim to proceed along with Title IX claim).  At the time of the hearing in this case, the Ninth Circuit had not weighed in, leaving this court with no binding precedent on this important topic.  However, the Supreme Court recently resolved that split in *Fitzgerald v.*

*Barnstable Sch. Cmty.*, ___ SCt ___, 2009 WL 128173 (Jan. 21, 2009), finding that Title IX does

not preclude constitutional claims under § 1983.

In light of *Fitzgerald*, this court finds that no preemption of Morgan's § 1983 claim is

warranted.  Moreover, this court agrees with the analysis set forth in *Communities*, *supra*.  This

court is persuaded that before preemption will preclude recovery under § 1983, the Title IX

claims must be "virtually identical" to the constitutional claims *and* the "remedies of Title IX

indicate that Congress intended to preclude reliance on § 1983."  *Communities*, 459 F3d at 685.

This court further agrees that the lack of carefully tailored remedies in Title IX evidences a lack

of intent "to create an enforcement scheme so comprehensive that it could serve as the exclusive

avenue for relief, thus precluding claims under § 1983."  *Id* at 691 (emphasis deleted).

Accordingly, this court declines to grant summary judgment against any of Morgan's claims on

the basis of defendants' preemption argument.

## II.  Personal Participation

"In order for a person acting under color of state law to be liable under section 1983 there

must be a showing of personal participation in the alleged rights deprivation:  there is no

*respondeat superior* liability under section 1983."  *Jones v. Williams*, 297 F3d 930, 934 (9th Cir

2002) (citations omitted).  With regard to both of her constitutional claims, Morgan lumps the

individual defendants together as a group, asserting that "defendants" (or "they") had knowledge

of her emotional characteristics, learned about her exposure to and participation in sexual

misconduct, and failed to respond appropriately.  Morgan seems to assert that all the individual

defendants were aware of the same information based on the daily "debriefings" between the

teachers and staff concerning RiverBend students.  *See, e.g.*, McNairy Depo., p. 51 ("every

afternoon we sit as a staff to debrief the day"); Mahoney Depo., p. 76 ("as we sit at the end of the day, if an issue comes up we discuss it with everybody").  The record also supports the conclusion that, although Mahoney had an informal role acting as the lead person in addressing issues raised at RiverBend (Mahoney Depo., p. 79), typically all six RiverBend staff were involved in the daily debriefings and any investigations or decisions on how to proceed. Mahoney Depo., pp. 75, 80; Brooke Depo., p. 115 ("as a staff we kind of tell each other what's going on so we all understand what's going on in RiverBend").

The record reveals that McNairy's involvement was significantly less than that of Mahoney and Brooke.[24]  However, for purposes of this motion, this court will assume that each of the individual defendants was aware of the same information at the same time due to the daily debriefings and will assume that they made a joint decision as to how to respond.  Nevertheless, as explained below, defendants' actions and alleged inaction, viewed individually or collectively, simply is insufficient to establish a violation of Morgan's constitutional rights.

## III.  Qualified Immunity (First and Second Claims)

Each of the individual defendants claims entitlement to qualified immunity against Morgan's due process and equal protection claims.  For the reasons that follow, this court

---

[24]  There is some evidence that Mahoney and Brooke learned in May 2003 about the "flashing" incident that took place on the John Day River trip and that both were involved in responding to that information.  Storey Decl., ¶¶ 13-16.  The same cannot be said of McNairy.  Instead, the available evidence indicates that McNairy first learned of the exposure incidents on or around October 22, 2003, some five months later.  McNairy Depo., p. 30.  McNairy then helped investigate those allegations, interviewing Storey and later participating in a group decision about "next steps."  *Id* at 35-36.  Some time later, McNairy overheard Morgan discussing this exposure incident with other students, prompting him to talk with Morgan and explain that she should not involve other students in a situation of such a "tender nature."  *Id* at 31-32.  A few months later, McNairy was told of Marcie Morgan's February 2004 telephone call to Mahoney and participated in a "brainstorming" session during which Mahoney, Brooke, and McNairy prepared the Incident Report (Exhibit 13) setting forth the tidbits of information they could collectively remember about the incidents.  McNairy Depo., pp. 41, 50-54.

concludes that the individual defendants, McNairy, Brooke, and Mahoney are entitled to qualified immunity because Morgan is unable to establish the violation of a constitutional right.

In analyzing a claim of qualified immunity, the court must make two inquiries: "First, we inquire whether, taken in the light most favorable to the party asserting the injury, that party has established a violation of a federal right. Assuming this threshold inquiry is satisfied, we consider whether the School Officials' conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Preschooler II v. Clark County Bd. of Trs.*, 479 F3d 1175, 1179-80 (9th Cir 2007) (internal quotations and citations omitted). While this sequence is "often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, ___ SCt ___, 2009 WL 128768 *2 (Jan. 21, 2009). After an exhaustive review of the record, this court concludes that the evidence viewed in the light most favorable to Morgan does not support the conclusion that Morgan's constitutional rights were violated and, therefore, need not address the second qualified immunity inquiry. Accordingly, the individual defendants are entitled to summary judgment against Morgan's First Claim for a substantive due process violation and against the Second Claim for an equal protection violation.

## A. **Substantive Due Process (First Claim)**

### 1. **Legal Standard**

The First Claim alleges that Morgan's liberty interest in her right to bodily integrity and "freedom from sexual abuse" was violated by defendants' inadequate response to their collective knowledge that students were engaging in conduct "that posed a pervasive and unreasonable risk of constitutional injury" to her. Second Amended Complaint, ¶¶ 30-31. Specifically, Morgan asserts that the individual defendants failed to adequately respond to their knowledge of

inappropriate sexual conduct between RiverBend students by failing to discover, investigate, report (to both legal authorities and Morgan's parents), and intervene to prevent harm to her. *Id* at ¶ 34.

### a. __Protected Interest__

The substantive due process clause of the Fourteenth Amendment protects a variety of interests not expressly enumerated in the Constitution, including a right to bodily integrity. Included are the "rights to be free from unjustified intrusions into the body, to refuse medical treatment, and to receive sufficient information to exercise these rights intelligently." *Benson v. Terhune*, 304 F3d 874, 884 (9th Cir 2002) (internal citations omitted). However, when considering a substantive due process claim, the court must "adopt a narrow definition of the interest at stake," *Raich v. Gonzalez*, 500 F3d 850, 863 (9th Cir 2007) (citations omitted), and "'careful[ly] descri[be] the asserted fundamental liberty interest.'" *Id*, citing *Washington v. Glucksberg*, 521 US 702, 721 (1997).

No Ninth Circuit case has allowed a substantive due process claim premised on a violation of the right to bodily integrity arising out of the failure of teachers or a school district to detect and prevent student-to-student sexual harassment in a public school.[25] While Morgan asserts a right to freedom from sexual abuse at the hands of her classmates, the general rule is that "members of the public have no constitutional right to sue state actors who fail to protect them from harm inflicted by third parties . . . ." *Johnson v. City of Seattle*, 474 F3d 634, 639 (9th

---

[25] In contrast, the Ninth Circuit has previously articulated that a student has a constitutional right to be free from sexual abuse at the hands of school employees. *Plumeau v. Sch. Dist. No. 40, County of Yamhill*, 130 F3d 432, 438 (9th Cir 1997) ("Thus, we agree [that] the Constitution protects a child's right to be free from sexual abuse by school employees while attending public school").

Cir 2007) (citation omitted).  This general rule springs from the observation of the Supreme

Court nearly 20 years ago that:

> . . . nothing in the language of the Due Process Clause itself
> requires a state to protect the life, liberty, and property of its
> citizens against invasion by private actors.  The Clause is phrased
> as a limitation on the State's power to act, not as a guarantee of
> certain minimal levels of safety and security.  It forbids the State
> itself to deprive individuals of life, liberty, or property without 'due
> process of law,' but its language cannot fairly be extended to
> impose an affirmative obligation on the State to ensure that those
> interest do not come to harm through other means.

*DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 US 189, 195 (1989).

The general rule that a state is not liable for failing to protect individuals from harm by

third parties is modified by two exceptions.  The "special relationship" exception applies where a

state actor abuses a special state-created relationship with an individual, such as in the case of

custody or involuntary hospitalization.  *Morgan v. Gonzales*, 495 F3d 1084, 1093-94 (9th Cir

2007), *cert. denied*, 128 SCt 1290 (2008); *L.W. v. Grubbs*, 974 F2d 119, 121 (9th Cir 1992), *cert.*

*denied*, 508 US 951 (1993).  The second exception is the "danger creation exception," under

which "state actors may be held liable where they affirmatively place an individual in danger by

acting with deliberate indifference to a known or obvious danger in subjecting the plaintiff to it."

*Kennedy v. City of Ridgefield*, 439 F3d 1055, 1062 (9th Cir 2006) ("*Ridgefield*"), *denying pet. for*

*rehr'g en banc*, 440 F3d 1091 (2006) (internal citations, quotations, and brackets omitted); *see*

*also Huffman v. County of Los Angeles*, 147 F3d 1054, 1059 (9th Cir 1998), *cert. denied*, 526 US

1038 (1999).  The second exception applies where the state creates a "danger that the plaintiff

would not have otherwise faced, as when the police reveal an accuser's name after assuring her

that she would be warned before any further action was taken." *Shanks v. Dressel*, 540 F3d 1082, 1088 n5 (9ᵗʰ Cir 2008), citing *Ridgefield*, 439 F3d at 1061.

The lynchpin of liability under the danger creation exception is proof that the defendant effectively prevented the plaintiff from protecting himself or prevented access to outside sources of help.  The defendant must "'affirmatively plac[e] an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid.'" *Johnson v. Dallas Indep. Sch. Dist.*, 38 F3d 198, 201 (5ᵗʰ Cir 1994), *cert. denied*, 514 US 1017 (1995), quoting *Wideman v. Shallowford Comm'y Hosp., Inc.*, 826 F2d 1030, 1035 (11ᵗʰ Cir 1987).[26]

### b.  Deliberate Indifference

The ultimate inquiry in any substantive due process case is whether the "behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" or "interferes with rights 'implicit in the concept of ordered liberty.'" *County of Sacramento v. Lewis*, 523 US 833, 847 and n8 (1998) (internal quotations and citations omitted).

The parties focus on whether defendants' conduct in placing Morgan at RiverBend and failing to act on the information they received about the sexually charged activities between her

---

[26]  *See also, Shanks*, 540 F3d at 1088 ("The danger creation exception . . . requires affirmative conduct on the part of the state creating a danger that the plaintiff would not have otherwise faced, as when the police reveal an accuser's name after assuring her that she would be warned before any further action was taken"); *Ridgefield*, 439 F3d at 1062 n.2 (noting that the premise of substantive due process danger creation case is that the "individual has been placed in a dependent and helpless position") (citation omitted); *Russell v. Gregoire*, 124 F3d 1079, 1093 n.10 (9ᵗʰ Cir 1997), *cert. denied*, 523 US 1007 (1998) (stating in *dicta* that "a state has no general duty to protect individuals against potential harm by third parties . . . unless the state creates the danger and removes the individual's ability to protect himself"); *D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, 972 F2d 1364, 1376 (3ʳᵈ Cir 1992), *cert. denied*, 506 US 1079 (1993) ("*Middle Bucks*") ("[P]laintiffs' allegations are insufficient to show, as required under *DeShaney*, that the school defendants either impermissibly limited the freedom of plaintiffs to act on their own behalf, or barred their access to outside support") (internal citations omitted).

and her classmates constituted "deliberate indifference." "'[D]eliberate indifference' is a

stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious

consequence of his action." *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 US

397, 410 (1997).  Thus, the "deliberate indifference" standard requires the plaintiff alleging a

substantive due process claim to show something beyond even the most culpable standard of tort

liability:

> It should not be surprising that the constitutional concept of
> conscience shocking duplicates no traditional category of common-
> law fault, but rather points clearly away from liability, or clearly
> toward it, only at the ends of the tort law's spectrum of culpability.
> . . . We have accordingly rejected the lowest common denominator
> of customary tort liability as any mark of sufficiently shocking
> conduct, and have held that the Constitution does not guarantee
> due care on the part of state officials; liability for negligently
> inflicted harm is categorically beneath the threshold of
> constitutional due process. . . .  It is, on the contrary, behavior at
> the other end of the culpability spectrum that would most probably
> support a substantive due process claim; conduct intended to injure
> in some way unjustifiable by any government interest is the sort of
> official action most likely to rise to the conscience-shocking level.

*Lewis*, 523 US at 848 (citations omitted); *see also*, *Daniels v. Williams*, 474 US 327, 331 (1986)

("Historically, this guarantee of due process has been applied to *deliberate* decisions of

government officials to deprive a person of life, liberty, or property.").

However, the applicable standard in the due process context is higher:  "We begin by

clarifying the standard of culpability for a due process right. . . .  The parties mistakenly suggest

that the choice is between 'shocks the conscience' and 'deliberate indifference' as the governing

standard, when in fact the latter is one subset of the former.  The Supreme Court has made it

clear . . . that only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F3d 1131, 1137 (9th Cir 2008), citing *Lewis*, 523 US at 846.

In determining whether the allegations made by the plaintiff "shock the conscience," the court must "look objectively at the specific circumstances of the school and child." *Preschooler II*, 479 F3d at 1181. The court must also be mindful that viable substantive due process claims must be more than "tort actions dressed up in constitutional garb." *Larson v Neimi*, 9 F3d 1397, 1399 (9th Cir 1993).

## 2. Claims Against RiverBend Teachers

In order to claim a protected interest, Morgan relies on the danger creation exception. Specifically, she contends that RiverBend's teachers created a danger to her: (1) by insufficiently supervising her classmates while on field trips and bus rides after they had notice in May 2003 that her classmates had subjected her to sexual harassment or abuse; and (2) by discouraging reports of the harassment and abuse to persons outside of RiverBend.

The thrust of Morgan's claims is that she was emotionally bullied[27] by other RiverBend students into participating in sexually charged conduct, including watching other students expose their genitalia, exposing her own genitalia, allowing male students to touch her genitalia, and touching those students' genitalia. Her substantive due process claim is premised upon the danger created to her by her placement in a school program with other students whose relative

---

[27] Emotional bullying is a form of relational aggression recognized as equally damaging to its victims as physical forms of aggression. *See* http://www.opheliaproject.org/main/ra_about3.html (last accessed Feb. 6, 2009). However, the term "emotional bullying" has yet to be found in any reported federal cases. Morgan repeatedly testified that she acquiesced to her classmates' requests that she participate in sexually charged conduct because she wanted to keep or make friends at RiverBend. A. Morgan Depo., pp. 34 ("gave in to peer pressure"), 54 (let Storey put his hand down her pants because she was "vulnerable at the time"), 67 (agreed to "flash" Wright and Liston because they were the "only guy friends" she had at RiverBend and she wanted more friends).

emotional maturity and awareness placed her at risk for being targeted for sexual harassment and abuse, coupled with the allegedly inadequate response by RiverBend's teachers to information they received concerning sexually charged activities between her and other RiverBend students while on school field trips and bus rides.

As discussed below, there is scant evidence that other RiverBend students posed the kind of risk to Morgan that she claims created a danger and caused her injury. Moreover, even assuming that such evidence is sufficient to show that Morgan was vulnerable to being targeted by her peers, the record does not support the conclusion that RiverBend's teachers affirmatively placed her in a position of danger by acting with conscience-shocking deliberate indifference to a known or obvious danger to Morgan. Thus, RiverBend's teachers are entitled to summary judgment against the substantive due process claim because, even assuming all facts in Morgan's favor, the teachers' conduct is not constitutionally actionable.

### a. **Placement at RiverBend**[28]

Woven throughout the record are sweeping statements concerning Morgan's emotional maturity level and the propensity of her RiverBend peers for the type of conduct which allegedly harmed her. Morgan essentially argues that she was a naive and emotionally immature innocent surrounded by a cadre of manipulative, street-wise bullies set on using her to satisfy their prurient desires. While the record supports the conclusion that Morgan was naive and less socially aware than her peers, it does not support the conclusion that there was a known or obvious danger she would be subjected to sexual harassment or abuse as a result of those vulnerabilities.

---

[28] Morgan does not separately plead the bare fact of her placement at RiverBend as a basis for creating a danger. *See* Second Amended Complaint, ¶ 39. At oral argument, however, Morgan specified that her placement at RiverBend was one basis for that theory.

Prior to Morgan's placement at RiverBend, a Speech and Language Evaluation revealed that Morgan had significant difficulty in the "social pragmatics of language, which is likely exaggerated by her ADHD and other emotional issues." Ex. O (3/19/01 Speech Language Evaluation Report), p. 4. This compromised her ability to express her thoughts and to maintain friendships:

> [Morgan] is unable to demonstrate her knowledge in many areas due to her inability to express her thoughts verbally in a sequential and logical manner. She is unable to maintain friendships due to her inability to follow conversational and social rules of making comments that are relevant to the topic, giving information that is clear and concise and providing an appropriate amount of information to a conversational topic.

*Id*.

A subsequent Psycho-Educational Report similarly revealed weakness in Morgan's comprehension of verbal information and ability to use verbal skills to solve new problems, which was "consistent with the attention problems, learning problems, and social skills problems." Ex. N (4/6/01 Psycho-Educational Report), p. 2. That same report noted that Morgan was "withdrawn and socially awkward," displayed "impulsivity and control of attention issues," and was "failing many of her classes and appears socially isolated." *Id*, pp. 4-5.

The testimony of RiverBend's teachers acknowledges that Morgan was socially naive, "lack[ed] much of the reasoning abilities of some of her average peers in the middle school, and definitely lack[ed] social boundaries." Brooke Depo., p. 90. She was unable to "read social cues," and RiverBend's teachers were concerned that as she matured, Morgan would need to learn to "regulate and modulate" her behavior into "what's socially appropriate, what's safe."

Mahoney Depo., p. 195.  RiverBend teachers routinely counseled RiverBend students, including

Morgan, on what was appropriate as far as social boundaries.  Brooke Depo., pp. 101-03.

Consistent with the above testimony and the pre-placement evaluations, the 4/17/01 IEP

prepared prior to Morgan's placement at RiverBend, states that Morgan has ADHD, was at that

time (spring of her sixth grade year) performing at a fourth grade level in math, and "lack[ed] the

pragmatic or social language skills necessary to develop healthy relationships with her peers," as

well as "mild to moderate dysfluencies at the word level in her language sample."  Ex. M, pp. 4-

5.  That IEP incorporated a number of social skill, pragmatic language, and fluency goals.  *Id* at

7, 9-10.  This information indicates that Morgan was struggling with peer relationships and

experienced significant communication difficulties.

Morgan contrasts her acknowledged limitations with evidence about other RiverBend

students, asserting that defendants placed her in an group of intensely predatory students, some of

whom were documented sexual offenders.  In support, she cites a document listing the "profiles"

of 16 RiverBend students, several of whom had a history of sexual abuse and two of whom are

listed as sexual offenders.  Ex. U.  However, that document reflects the RiverBend student

population during the 2006-07 school year, over two years after Morgan left RiverBend in

February 2004.  The document therefore is not probative of the student population at RiverBend

at the time of Morgan's placement or attendance at RiverBend.  Morgan also cites the IEPs of her

alleged abusers, Bednarczyk, Liston, Storey, and Wright.  While those IEPs reflect that those

students were grappling with a host of behavioral issues, only Liston's IEP indicates that his

behavioral issues included "trouble keeping . . . hands to himself in class, on the bus, and on the

playground" and that "[h]is actions and verbal expression are sometimes sexual."  Ex. NN, p. 5.

The record overwhelmingly reveals that the placement decision[29] was made after a series of professional assessments of Morgan's needs and an evaluation of the availability of other resources. The record also lacks evidence that the other students who allegedly targeted Morgan, though perhaps more socially "aware" than Morgan, were predisposed to sexually harassing or abusing other students. At worst, this evidence indicates that defendants failed to perceive that Morgan would be targeted for emotional bullying by Storey, Bednarczyk, Walker, or Wright, or for sexual harassment or abuse by Liston.

In short, the evidence in the record, taken as a whole and viewed in Morgan's favor does not support the conclusion that the mere placement of Morgan at RiverBend exposed her to a known or obvious risk of sexual harassment or abuse at the hands of her peers. Thus, consistent with Morgan's allegations which focus on the alleged inaction of RiverBend's teachers after May 2003 (Second Amended Complaint, ¶¶ 31, 34, 39), her substantive due process claim stands or falls based on defendants' response to information they learned over the course of Morgan's attendance at RiverBend.

### b. Knowledge Prior to Late October 2003

Morgan contends that RiverBend's teachers played an affirmative role in creating the danger to her by inadequately supervising students on field trips and actively discouraging the reporting of the John Day "touching" incident when they learned of it in October 2003. Specifically, Morgan asserts that RiverBend's teachers created a danger to her by taking her on additional field trips after May 2003 because they knew about the sexual harassment and abuse

---

[29] It is unclear what role, if any, Mahoney, Brooke, or McNairy played in Morgan's IEP placement. Her April 17, 2001 IEP lists a six–member "Placement Team," which lists none of those individual defendants. Ex. M, p. 12. Marcie Morgan testified that Brooke was on the IEP team, although that may have related to the team assembled after Morgan was placed at RiverBend. M. Morgan Depo., p. 71.

she was enduring shortly after the John Day River trip. She alleges that they failed to take her reports seriously, adequately investigate, and report the information to any school or law enforcement authorities. She also contends that their comments to Morgan and other students actively discouraged reporting to outside sources of help, allowing the harassment and abuse to continue during later field trips and school bus rides.

Two students have stated that, while on field trips, students were "frequently left unsupervised and were able to leave the sight of the teachers and other chaperones for extended periods of time." Storey Aff., ¶ 7; *see also* Liston Decl., ¶ 7. A lack of supervision, in and of itself, however, is insufficient. Moreover, even awareness of a danger is insufficient. The danger creation exception opens the door to liability only where the defendant engaged in affirmative conduct creating that danger or removing the plaintiff's ability to protect herself. *Grubbs*, 974 F2d at 121, citing *DeShaney*, 489 US at 201.

Morgan alleges that through emotional bullying using her innocence and desire to have friends, her classmates manipulated her into engaging in sexually charged activities. One of the primary difficulties in this case is that, when directly asked, Morgan denied that any conduct involving sexual overtones was going on while on field trips, leaving RiverBend's teachers in the dark about the more egregious allegations of sexually charged conduct between Morgan and other students.

When directly asked while still on the John Day River trip, Morgan denied that anything happened on her walk up the hill with Storey, Walker, and Bednarczyk. Morgan did not tell Mahoney that Storey touched her and there is no evidence that RiverBend's teachers were aware of the "hand jobs" Morgan allegedly later performed on Storey. RiverBend's teachers first

learned about the "flashing" incident (involving the exposure by Morgan to Storey of her brassiere-clad chest) from Bednarczyk or another student after returning to Bend. RiverBend's teachers responded by talking to the students and admonishing Morgan to see to it that no further "flashing" incidents occurred. Although Morgan now contends that Storey and Walker "taunted [her] persistently and manipulated [her] into sexual conduct," Morgan Decl., ¶ 10, nothing in the record indicates that Morgan conveyed to any RiverBend teacher that the "flashing" incident was nonconsensual or that she faced threats or other undue pressure to participate. Absent such evidence, this court is persuaded that the individual defendants' failure to do no more at that time than admonish Morgan does not trigger any claim that they were deliberately indifferent to a known or obvious risk of serious harm to Morgan at the hands of her peers, much less that they took an "affirmative" act that placed Morgan in danger.

Similarly, when directly asked while on the Smith Rock State Park trip, Morgan again denied that anything untoward was going on in her tent. While the record supports the conclusion that Morgan exposed her genitals to Storey and Wright, Morgan flatly denied to Mahoney that anything happened. Mahoney followed up by talking with Storey and Wright, who denied using the term "pussy" and also denied that anything happened. Mahoney did nothing further to investigate the Smith Rock State Park tent incident after those denials. Morgan did ask Mahoney about some of the sexual language used by her peers during the two field trips to the John Day River and to Smith Rock State Park. However, when directly asked by Mahoney what happened between herself and Story (during the John Day River rafting trip) and in her tent (while on the Smith Rock State Park trip), Morgan denied that anything had happened and defendants took those denials at face value. Given that Storey and Wright told Morgan to tell

Mahoney that nothing happened, RiverBend's teachers had no contradictory information which might have alerted them to a need to investigate further.  Their lack of further action in the face of denials by the three involved students does not translate into anything close to a conscience-shocking deliberate indifference to a substantial risk of serious harm to Morgan.  The only remaining issue is whether the individual defendants' actions some time later in the fall of 2003 raise to that level.

### c.  Late October 2003 Revelations

Assuming all inferences in Morgan's favor, Morgan's teachers learned in late October 2003 that Storey had touched Morgan's pubic area skin to skin once while on the John Day raft trip five months earlier and at some point had participated in an exposure incident by pulling her shorts down and observing Storey pull his pants down.  This revelation came two months into the 2003-04 school year, some period of time after the Smith Rock State Park trip and following a school-wide discussion about social boundaries when Morgan told Brooke that Storey had grabbed her crotch during a camping trip.  Mahoney and Brooke followed up by talking to Morgan several times and separately interviewing Bednarczyk, and Storey.  At the conclusion of those interviews, the teachers determined that the incidents involved no coercion, force, or foul play.

RiverBend's teachers told Morgan they would need to talk to her parents, which resulted in Morgan decompensating, balling up into a "fetal" position and pleading that her parents not be told because they would ground her "for life" or send her away.  In response, Mahoney and Brooke agreed not to say anything to her parents, simply instructing Morgan to make sure it did not happen again.  Faced with no evidence of coercion, a single "skin to skin" touch nearly half a

year earlier by a student a year younger than Morgan and a mutual exposure incident between

Morgan and that same student, pubescent adolescents who were just beginning to explore dating

and their emerging sexuality, and Morgan's desperate pleas that her parents not be told,

RiverBend's teachers opted not to report and simply "handle the situation by reinforcing the

importance of respecting personal boundaries with the involved students, and by increasing

[their] oversight of these students."  Brooke Decl., ¶ 7; McNairy Decl., ¶ 11.

All of the incidents in this case involved alleged peer-to-peer encounters between

students ranging in age between nearly age 13 to nearly age 15.  Morgan was chronologically the

eldest of the students involved, more than a year older than Storey and Wright, and a week shy of

being a year older than Liston.  Although she attended the same alternative middle school as

these alleged aggressors, Morgan contends that her emotional immaturity rendered her more

susceptible to relational aggression and her naivete put her at a disadvantage in knowing how to

respond to the peer pressures she faced.  She faults defendants for not reporting the conduct

immediately to authorities under the child abuse statute or to her parents who could have

removed her from the school sooner.

What defendants knew as of October 2003 may or may not have required reporting under

the child abuse statute, and whether or not they in fact violated that statute has no bearing on

Morgan's substantive due process claim.  "Mere violation of a state statute does not infringe the

federal Constitution."  *Snowden v. Hughes*, 321 US 1, 11 (1944) (citations omitted).  It is

troubling that RiverBend's teachers failed to tell Morgan's parents about the information they

learned in October 2003.  However, Morgan has pointed to no affirmative obligation on the part

of the teachers to report the incidents to her parents.  Absent such an obligation, Morgan's

parents may well have pursued a tort claim alleging negligence or gross negligence, but this is

not such a claim.  Instead, the sole claim before this court is one grounded in the Constitution and

based on a substantive due process violation.  While "[a] liberty interest may arise from positive

law sources," *Miller v. California*, 355 F3d 1172, 1176 (9th Cir 2004), the "assumption that every

state law violation invariably gives rise to a substantive due process claim is inconsistent with the

principle that substantive due process is not a 'font of tort law' that superintends all official

decision making."  *Shanks*, 540 F3d at 1089 quoting *Lewis*, 523 US at 847-48 & n8.

This leaves Morgan's contention that RiverBend's teachers discouraged reporting of the

May 2003 "touching" incident between Storey and Morgan when they learned of it in October

2003, by telling Storey and Morgan that they (the teachers) did not want the police involved.[30]

*See* Morgan Depo., p. 59; Storey Decl., ¶ 14.  In hindsight, the decisions not to report and to

"keep the police out of it" left the door open for further acts of sexual harassment toward Morgan

by her classmates.  However, the issue in a case relying on the danger creation exception is

whether the alleged deliberate indifference caused the plaintiff to undergo harassment or make

them more vulnerable to it.  Supreme Court authority "requires more than non-responsiveness; it

requires that the indifference result in harassment or render her vulnerable to harassment."

*Stanley v. Trs. of Cal. State Univ.*, 433 F3d 1129, 1137 (9th Cir 2006), citing *Davis v. Monroe*

*County Bd. of Educ.*, 526 US 629, 641 (1999).  Even "apparent indefensible passivity" or

allegations that the defendants "stood by and did nothing when suspicious circumstances dictated

---

[30]  The teachers' testimony indicates that their comments were directed at ensuring that the incident not become fodder
for the students schooltime conversations.  That interpretation is consistent with the other evidence in the record that
RiverBend's teachers devoted themselves to preparing RiverBend's students, including Morgan, for the inevitable changes they
would face on their path to adulthood.  However, because this court is currently considering a summary judgment motion, all
inferences must be drawn in the light most favorable to Morgan.  This court thus assumes that the teachers' comments were an
affirmative effort to discourage reports of the incident to persons outside of RiverBend.

a more active role for them" is not sufficient. *DeShaney*, 489 US at 203; *Middle Bucks*, 972 F2d at 1376. The essence of Morgan's allegations is that the individual defendants should have taken a more active role in bringing the information they had concerning sexually charged conduct between her and her classmates to the attention of authorities or her parents. That is insufficient under *DeShaney*.

### d. Incidents After October 2003

Following late October 2003, the record reveals only one additional incident between Morgan and Storey, namely the "pool incident" in December 2003 or January 2004. That incident involved a report by Morgan that during a field trip to Juniper Pool, Storey swam underneath her, grabbing her thigh and touching her "way too close." Mahoney immediately removed Storey from the pool. The teachers' immediate and effective response obviates any argument that the "pool incident" provides a viable basis on which to premise a substantive due process claim.

The only further incident occurred during a school bus ride, when Liston instigated a strip poker game between himself, Wright, and Morgan. As discussed above, Liston is the only student whose school records included a history of sexual actions or verbal expression. Although Liston apparently began attending RiverBend in November 2002, nothing in the record indicates that he was involved in prior incidents of sexually harassing conduct toward Morgan. Liston, Wright, and Morgan presumably had been riding the same school bus together since Wright's arrival in Janaury 2003 without a hint of a problem. School bus rides are supervised by the driver and monitored by video camera. After the strip poker game was captured by a school bus

video camera, the bus driver ordered Liston and Wright to tell Mahoney, who in turn ordered

Morgan to sit up front by the bus driver, ending any further problems.

This court recognizes that, in hindsight, the decision by RiverBend's teachers to take no

action other than talking to students in October 2003 left the door open to further incidents

between that date and early February 2004, when Morgan told her parents what had been going

on.  However, as made clear by the Supreme Court, the substantive due process clause does not

guarantee "certain minimal levels of safety and security," nor does it "impose an affirmative

obligation on the State to ensure that [a citizen's interest in life, liberty or property] do not come

to harm through other means."  *DeShaney*, 489 US at 195.  RiverBend's teachers did not create

or control the emotional profiles or social or sexual proclivities of Morgan's peers.  Nor has

Morgan cited any evidence indicating that RiverBend's teachers conferred privileges on

particular students which would render them more capable of isolating her and subjecting her to

abuse, which distinguishes this case from others which have found application of the danger

creation exception appropriate.  *See*, *e.g.*, *Grubbs*, 974 F2d at 121-22 (elevating violent sex

offender with "extraordinary history of unrepentant violence against women and girls" to serve as

a cart boy and requiring registered nurse to work alone with him sufficient to establish

affirmative act creating danger); *Swader v. Com'wlth of Va.*, 743 F Supp 434 (ED Va 1990)

(daughter of nurse required to live on prison grounds raped and killed by inmate allowed to work

unsupervised in an area in the location of nurse's home).  Moreover, nothing in the record

indicates that the field trips or bus rides in and of themselves exposed Morgan to an inherently

dangerous environment.  *See Middle Bucks*, 972 F2d at 1375 (rejecting argument that existence

of darkroom and of a single restroom in high school classroom subjected plaintiffs to an

inherently dangerous environment).

### e.  Conclusion

The issue before this court with respect to Morgan's claim for a substantive due process

violation by the individual defendants is not whether with the benefit of hindsight they might

have responded differently.  Instead, the issue is whether their actions or inactions, viewed in

light of what they knew at the time, affirmatively placed Morgan in danger and were sufficiently

shocking to the contemporary conscience to have triggered constitutional concerns.  Taken in its

entirety and viewed in Morgan's favor, the record simply does not support affirmative acts

placing Morgan in danger or conscience-shocking indifference by RiverBend's teachers to a

known or obvious risk of danger to Morgan based on the information they acquired regarding the

treatment of Morgan by her peers.  Although the record supports the inference that RiverBend's

teachers were aware of certain aspects of the encounters between Morgan and her classmates

between May 2003 and early 2004, the record (taken in its entirety and viewed in Morgan's

favor) does not support a finding of the level of deliberate disregard required to sustain a

violation of Morgan's constitutional right to due process.  Accordingly, the individual defendants

are entitled to summary judgment against the First Claim.

### B.  Equal Protection (Second Claim)

Morgan also alleges a claim for violation of her right to equal protection, contending that

the individual defendants' actions were driven by gender or disability discrimination.  The

pleadings allege generally that Morgan was treated "differently and [held] to a disparate and

unequal standard as compared to other students of equal rank and status."  Second Amended

Complaint, ¶ 45.  More particularly, Morgan alleges that RiverBend's teachers responded differently to the complaints of similarly-situated non-disabled students and subjected her to being targeted by harassment by same age peers with greater emotional maturity and awareness. *Id*, ¶¶ 48-49.

### 1.  Legal Standard

The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  Denials by any person acting under color of state law are actionable under § 1983.  In order to establish a § 1983 equal protection violation, Morgan must show that the individual defendants, acting under color of state law, discriminated against her as a members of an identifiable class and that the discrimination was intentional." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F3d 1130, 1134 (9th Cir 2003) (citation omitted).

An equal protection claim turns on proof that the defendant "acted in a discriminatory manner and that the discrimination was intentional."  *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F3d 736, 740 (9th Cir 2000) (citation omitted).  A "long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory *intent* or *motive.*"  *Navarro v. Block*, 72 F3d 712, 716 (9th Cir 1995) (emphasis in original; citations omitted).  Thus, to avoid summary judgment against her equal protection claim, Morgan must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the individual defendants' conduct was motivated by gender or disability discrimination.  *Bingham v. City of Manhattan Beach*, 341 F3d 939, 948-49 (9th Cir 2003) (citations omitted).

///

///

## 2. Gender Discrimination

Morgan is a member of an identifiable class with respect to her equal protection claim because she alleges that she is a female student whose complaints were treated differently than her male peers. Second Amended Complaint, ¶¶ 47, 50. Specifically, she alleges that the individual defendants treated male students preferentially by: (1) failing to punish male students; (2) threatening to punish her and leading her to believe she would get into trouble if any further sexually charged conduct occurred again; and (3) believing the male students, but dismissing her complaint. *Id* at ¶ 50.

A searching review of the record reveals that the only individual defendant against whom Morgan proffers evidence of disparate treatment is Mahoney. Specifically, Mahoney testified that he previously reported a situation to police that involved two boys touching each other which in Mahoney's view involved a power and control differential. Mahoney Depo., pp. 148-49. Morgan cites this testimony as proof of gender discrimination because Mahoney failed to perceive a power differential between her and her classmates, while he recognized the same type of power imbalance between the boys. As further evidence of Mahoney's gender-based animus, Morgan cites Liston's statement that Mahoney said "boys will be boys" when he learned about the incidents of exposure on the school bus (Liston Decl., ¶ 12), as well as a snippet of Mahoney's testimony that when evaluating whether new female students should enter the RiverBend program, he considers such things as her social skills, including whether she is "manipulative." Mahoney Depo., pp. 24-25.

///

///

The difficulty with these examples is that Morgan offers no basis to infer – other than the mere fact of the different genders of the alleged victims – that Mahoney's decisions to report in one instance and not report in another instance were based on gender animus. Mahoney testified unequivocally why he perceived the incident between the two boys to require police investigation, and his reasons had nothing to do with gender. *Id* at 148-49. Nor does the alleged comment by Mahoney that "boys will be boys" show gender animus. That comment, allegedly made while Mahoney was investigating the strip poker incident on the school bus, was made during the same conversation when Mahoney admonished the boys to stop their inappropriate behavior. Liston Decl., ¶ 12. Someone – presumably Mahoney – then instructed Morgan to sit up in the front by the bus driver which effectively ended the incidents on the bus. Viewed in that context, Mahoney's offhand comment that "boys will be boys" offers an insufficient basis on which to premise an equal protection claim. Similarly, Mahoney's statement that he considers the social skills of girls entering RiverBend to determine how they will fit in to RiverBend's predominately male population is not evidence of gender animus. Mahoney testified that each student is evaluated on a case-by-case basis, and nothing about his discussion as to the types of things he considers hints at gender animus, much less that his decisions two years later as to how to respond to the information he learned about Morgan's encounters with her classmates was motivated by gender discrimination. Accordingly, Morgan's claims of an equal protection violation fail for lack of any evidence of discriminatory intent or motive.

///

///

///

### 3. <u>Disability Discrimination</u>

Morgan also alleges that the RiverBend teachers violated her equal protection rights on the basis of her disability by treating her "differently and holding her to a disparate and unequal standard as compared to other students of equal rank and status" and "responding to the complaints of similarly situated non-disabled students differently thereby denying her of protected services on the basis of her class status." Second Amended Complaint, ¶¶ 45, 49. Morgan subsequently clarified that she bases her claim on the individual defendants' failure to report the child abuse she suffered, even though it would have reported the same abuse if the victim was a chronologically and emotionally younger child.

Morgan contends that she is a member of an identifiable sub-class of disabled students, namely those with a disability that affects their emotional age or maturity level. She contends that her victimizers, although chronologically younger, were significantly more emotionally mature and therefore able to manipulate and victimize her. She contends that the District has a policy, custom, or practice of presuming that coercion does not exist when the alleged perpetrator is chronologically younger or the same age as the alleged victim. As a result, she contends that those students with a disability affecting their emotional age or maturity level are placed at risk for being victimized by their peers who are not emotionally disabled.

Morgan asserts that she should have been treated the same as a young child due to her level of emotional maturity. Instead, she and others in the same sub-class of disabled students (those with a disability that affects their emotional age or maturity level) are treated differently than non-disabled students who either are: (1) the same age and level of emotional maturity/strength as their aggressors; or (2) younger and less emotionally mature/strong than their

aggressors.  The alleged discrimination is based on a presumption that coercion does not exist

between students of the same age.  As a result, Morgan contends that RiverBend's teachers do

not report sexual conduct between students of the same age, even where the aggressor is

significantly more emotionally mature or stronger than the victim.  This leaves the door open for

the more emotionally mature student to target disabled students who, although the same age, are

vulnerable to victimization due to their relative emotional immaturity.

Morgan's theory is that if she had she been considered to be much (emotionally) younger

than her classmates at RiverBend, the individual defendants admit they would have reported the

abuse she suffered.  Instead, they relied on her chronological age in assessing their duty to report,

which Morgan contends put her at a distinct disadvantage as a result of her disability because the

incidents she suffered at the hands of her classmates were not reported.

Morgan's equal protection claim is controlled by *Lee v. City of Los Angeles*, 250 F3d 668

(9th Cir 2001).  In *Lee*, a mentally disabled resident of California was arrested and then

mistakenly identified as a fugitive with the same last name.  Police officers both in California and

in New York failed to take proper steps to verify that the person in their custody was in fact the

fugitive, including failing to compare his physical characteristics and obvious mental

impairments, to those of the fugitive.  He was incarcerated in a New York state prison for two

years where he was sexually molested.  Among other constitutional claims, the conservator of his

estate alleged an equal protection claim based on the failure to provide sufficient training

regarding mentally disabled persons or to implement other procedures to protect them.  *Id* at 687.

///

///

The Ninth Circuit flatly rejected that claim, noting:

> Reading plaintiffs' claim in the most favorable light, we conclude that plaintiffs do not allege that defendants treat disabled persons as a protected class differently from other similarly situated individuals "who come into contact with the criminal justice system." Indeed, the gravamen of plaintiffs' complaint is that defendants *failed* to treat disabled persons differently from others similarly situated.

> With respect to the discriminatory purpose element of their equal protection claim, plaintiffs plead only that defendants knowingly or with deliberate indifference to the rights of the mentally disabled adopted facially neutral policies of inaction that have had a discriminatory impact on disabled persons. Plaintiffs failed to allege that defendants' acts or omissions were motivated by discriminatory animus toward the mentally disabled as a protected class. The mere fact that defendants' facially neutral policies had a foreseeably disproportionate impact on an identifiable group does not mean that they violated the Equal Protection Clause.

*Id* (emphasis in original; citation omitted).

The thrust of Morgan's claim is that the individual defendants failed to treat emotionally immature disabled students as significantly younger non-disabled students when reporting child abuse. She contends that the abuse would have been reported had she been treated the same as a young child, which is the class of persons she claims are her true comparators.

This argument is indistinguishable from *Lee*. The essence of Morgan's argument is that a facially-neutral policy (of reporting cases of abuse where the victim is a chronologically younger child) results in discrimination against older emotionally disabled students. Under *Lee*, this is insufficient. Nor does the record support a finding of animus toward emotionally disabled students in particular, or against disabled students generally. Not a shred of evidence supports a finding that RiverBend's teachers acted in response to reports of the incidents between Morgan

and her classmates with an invidious or discriminatory purpose toward disabled students. Accordingly, the individual defendants are entitled to summary judgment against Morgan's Second Claim.

## IV.  Constitutional Claims Against the District (First and Second Claim)

As discussed above, each of Morgan's constitutional claims against the individual defendants fails for lack of proof of a constitutional violation.  A lack of individual liability does not always equate to absolution of the municipality, such as when the plaintiff can show a constitutional violation by the municipality despite a finding that the individual municipal actors are exonerated on the basis of good faith.  *See Gibson v. County of Washoe, Nev.*, 290 F3d 1175, 1186 n7 (9th Cir 2002), *cert. denied*, 537 US 1106 (2003).

However, in this case, this court concludes that Morgan cannot show a constitutional due process violation because the record does not support the inference that the individual actors acted with conscience-shocking deliberate indifference to a known or obvious danger.  *See City of Los Angeles v. Heller*, 475 US 796, 799 (1986) (no showing of lack of probable cause or excessive force in making an arrest) (*per curiam*); *Quintanilla v. City of Downey*, 84 F3d 353, 355 (9th Cir 1996), *cert denied*, 519 US 1122 (1997) (finding no showing of excessive force in the use of a police dog and noting that "a public entity is not liable for § 1983 damages under a policy that can cause constitutional deprivations, when the factfinder concludes that an individual officer, acting pursuant to the policy, inflicted no constitutional harm to the plaintiff") (citing *Heller*).  This conclusion is fatal to Morgan's substantive due process claim against the District.

Similarly, this court concludes that Morgan has failed to provide sufficient evidence of discriminatory intent, entitling the individual defendants to summary judgment against Morgan's

equal protection claims.  Nor does anything in the record support the conclusion that District

made a policy choice at least in part based on its adverse effect on disabled students, or any sub-

class thereof.  For these reasons, the District is likewise entitled to summary judgment against

Morgan's constitutional claims.

## V.  __Title IX Claim (Third Claim)__

Finally, the District[31] seeks summary judgment against Morgan's Third Claim for a

violation of Title IX.  Title IX provides that "[n]o person in the United States shall, on the basis

of sex, be excluded from participation in, or denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial

assistance . . . ."  20 USC § 1681(a).  The premise of the Third Claim is that the conduct of

Morgan's peers constituted unwanted student-to-student sexual harassment which deprived her

of educational benefits.  The Ninth Circuit allows a plaintiff to bring a Title IX claim premised

upon a hostile environment theory:  "[T]wo circuits have held, as we do, that plaintiffs may state

hostile environment claims for student-to-student harassment, as well as teacher-to-student

harassment."  *Oona v. McCaffrey*, 143 F3d 473, 476 (9th Cir 1998).

*Davis* outlines four requirements for the imposition of school district liability under Title

IX for student-on-student harassment:

> First, a school district's liability is limited "to circumstances
> wherein the recipient exercises substantial control over both the
> harasser and the context in which the known harassment occurs."

---

[31]  The individual defendants cannot be found liable under Title IX:  "The Government's enforcement power may only be exercised against the funding recipient, *see* [20 USC] § 1682, and we have not extended damages liability under Title IX to parties outside the scope of this power."  *Davis*, 526 US at 641 (citations omitted); *see also Soper v. Hoben*, 195 F3d 845, 854 (6th Cir 1999), *cert denied*, 530 US 1262 (2000) ("only recipients of federal funds may be held liable for damages under Title IX").  Thus, the Third Claim is alleged only against the District.

Second, a school district can be held liable in damages only where the plaintiff suffers "sexual harassment . . . that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school." . . . Third, a school district is liable in damages only where it has "actual knowledge" of the harassment. . . . Fourth, "[i]f a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment.  That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it."

*Reese*, 208 F3d at 739, citing *Davis*, 526 US at 641-52.

Defendants contend that Morgan can meet none of these standards.  This court agrees with respect to the third and fourth requirements and, therefore, concludes that the District is entitled to summary judgment against the Title IX claim.

The first requirement is that the District exercise substantial control over the harasser and the context in which the harassment occurs.  This requirement can be met by proof that the misconduct occurred "during school hours and on school grounds" when the "harasser is under the school's disciplinary authority."  *Davis*, 526 US at 646 (citations omitted).  An argument could be made that none of the allegedly harassing acts took place on "school grounds," given that the most egregious conduct took place on school field trips or on bus rides to and from RiverBend.  However, it is undisputed that field trips are a core part of RiverBend curriculum and were under the supervision of RiverBend teachers.  The record does not clearly reveal the lines of authority with regard to supervision while on the school bus.  However, the record it is undisputed that the person to whom the bus driver reported the conduct (or ordered Liston and Wright to report) was Mahoney.  Thus, the record supports the conclusion that Morgan can satisfy this threshold inquiry.

The second requirement is that the harassment is sufficiently severe, pervasive, and objectively offensive that Morgan was denied an educational benefit. This inquiry "'depends on a constellation of surrounding circumstances, expectations, and relationships,' including, but not limited to the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 US at 651, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 US 75, 82 (1998). Courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis* explicitly recognizes that schools serve as the testing ground for a variety of behaviors that would be unacceptable elsewhere, and that only sufficiently egregious behavior will subject a funding recipient to liability:

> [A]t least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 US at 651-52.

Morgan has presented evidence that she was "occasionally" subjected to "negative and unwanted teasing by other students" during the 2003-04 school year. Liston Decl., ¶ 8. She also asserts that male classmates Storey, Wright, Walker, and Liston "persistently" taunted her and manipulated her into sexual conduct with them and that Bednarczyk manipulated her into sexual conduct. Morgan Decl., ¶ 10. The first of these somewhat conclusory statements is supported by

no further explanation or evidentiary submissions.  The second statement is supported by the evidence concerning the sexual conduct between Morgan and other RiverBend students, but is highly dependent upon Morgan's view of the conduct as manipulative.  In combination, these sworn statements and the evidence concerning what transpired arguably might be enough to stave off summary judgment on the second prong of the Title IX inquiry.  Morgan's Title IX case, however, flounders on the remaining two requirements.

The third requirement is that the District must have actual knowledge of the harassment. It is undisputed that RiverBend's teachers never perpetrated or witnessed first-hand the efforts of other students to goad Morgan into participating in sexual conduct.  To the contrary, when questioned, Morgan denied that anything happened.  Moreover, nothing in the record indicates that RiverBend teachers were aware of the allegedly coercive nature of other RiverBend students' interactions with Morgan.  There is some evidence that RiverBend teachers became aware that Morgan and other students had engaged in a sexually charged "flashing" incident while on the John Day River trip and nearly six months later became aware that Storey admitted touching Morgan during that same trip.  However, missing from the record is any indication that, prior to the February 2004 telephone call from Marcie Morgan, any RiverBend teacher was told, either by Morgan, other students, or anyone else, that Morgan was an unwilling participant in this sexually charged conduct.  Consistent with their view of the conduct as the natural emergence of pubescent sexuality, RiverBend's teachers struggled to strike the balance between allowing RiverBend students to explore their emerging identities while prevent them from engaging in inappropriate sexually charged conduct.  They did this by directing students to respect personal boundaries, recast vulgar slang into accurate anatomical language, and otherwise prepare for the

challenges they would face in reentering mainstream educational programs.  Absent evidence that RiverBend's teachers knew that Morgan faced undue pressure to participate, the record lacks a basis on which to conclude that the District had actual knowledge of harassment.

Finally, the fourth requirement is that the District was deliberately indifferent to the harassment.  Morgan alleges that RiverBend's teachers' inadequate response to information caused her to suffer ongoing harassment and abuse at the hands of her classmates.  Analogizing this case to two Title IX cases from other circuits, *Vance v. Spencer County Pub. Sch. Dist.*, 231 F3d 253 (6th Cir 2000) and *Murrell v. Sch. Dist. No. 1, Denver Colorado*, 186 F3d 1238 (10th Cir 1999), Morgan argues that talking to the alleged perpetrators is not sufficient to disestablish deliberate indifference.   However, both of those cases are distinguishable.

In *Murrell*, the plaintiff was born with spastic cerebral palsy which severely impaired her ability to use and control the right side of her body.  She also functioned "intellectually and developmentally at the level of a first grader."  *Murrell*, 186 F3d at 1243.  Before she began attending special education classes, her mother informed the high school principal and her teachers that she had been sexually assaulted at her previous school.  At the same time, school officials appointed another special education student as a janitor's assistant, which gave him access to certain unsupervised areas of the school.  School officials knew that the student had "significant disciplinary and behavioral problems which included engaging in sexually inappropriate conduct."  *Id*.  Over the course of the next month, the janitor's assistant repeatedly took the plaintiff to secluded areas of the school where he battered and sexually assaulted her.  Despite their knowledge of several of these incidents, school officials never told the plaintiff's parents.  After the plaintiff was hospitalized in a psychiatric hospital, the mother learned of the

sexual assaults and the batteries.  School officials rejected the mother's suggestion that they

should investigate.  Instead, they suspended the plaintiff and left the other student in his position

as a janitor's assistant.  The Tenth Circuit reversed the dismissal of the plaintiff's Title IX claim,

noting that the principal's "complete refusal to investigate the known claims of the nature

advanced by [plaintiff's mother], if true, amounts to deliberate indifference."  *Id* at 1248.  The

court also reversed dismissal of the § 1983 equal protection claim against the principal and

teachers, finding sufficient allegations to support a claim that "defendants actually knew of and

acquiesced in" the conduct by the janitor's assistant.  *Id* at 1250.

The following year, the Sixth Circuit considered a claim under Title IX, examining the

"nature and extent of circumstantial evidence needed to permit a reasonable inference of gender

discrimination by school officials in the student-on-student sexual harassment context."  *Vance*,

231 F3d at 255.  Over the course of her sixth and seventh grade years, the plaintiff was

repeatedly subjected to comments that she was gay, physical assaults, thefts and destruction of

her personal property, and vulgar name-calling.  She or her parents immediately reported the

incidents to school personnel, including school counselors and the principal.  The only action

taken by school officials was to talk to the alleged perpetrators, who predictably continued – and

in fact escalated – the assaults.  The court upheld a jury verdict in plaintiff's favor, noting that

once the school district "had knowledge that its response was inadequate, it was required to take

further reasonable action in light of the circumstances to avoid new liability."  *Id* at 262.

Unlike those cases, this case does not involve repeated violent physical and sexual

assaults, nor does it involve repeated complaints to school personnel by Morgan or someone on

her behalf that went completely ignored.  As discussed above, RiverBend's teachers were faced

50 - OPINION AND ORDER

with ongoing concealment both by Morgan and by other RiverBend students of the nature of the

encounters, pleas by Morgan not to tell her parents, and a self-imposed desire to prepare

RiverBend's students, including Morgan, for the inevitable changes they would face on their

journey from adolescence to adulthood.  While, in hindsight, RiverBend's teachers might have

chosen a more aggressive or different response to the information they learned, their response

does not fall within the ambit of deliberate indifference nor did it cause Morgan to undergo

harassment or make her more vulnerable to it.  Accordingly, the District is entitled to summary

judgment against the Third Claim.

## **ORDER**

For the reasons stated above, defendants' Motion for Summary Judgment (docket #46) is

GRANTED.

DATED this 6th day of February, 2009.

_/s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge